

Tagged Opinion

**ORDERED in the Southern District of Florida on March 12, 2010.**

**John K. Olson, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Fort Lauderdale Division**
www.flsb.uscourts.gov

**In re**:

**Maxco Petroleum, LLC**,

      Debtor.

Case No. 08-14652-BKC-JKO

Chapter 7 (Previous Chapter 11)

_____/

Sonya L. **Salkin**, *Chapter 7 Trustee*,

      Plaintiff,

**-v-**

**Palm Beach International, Inc.**, and
Aabhash Prahdan,

      Defendants.

Adv. No. 08-01833-JKO

_____/

Sonya L. **Salkin**, *Chapter 7 Trustee*,

      Plaintiff,

1

**-v-**                                                          Adv. No. 08-01862-JKO

Henri **Hage**,

          Defendant.

_____/

### Findings of Fact and Conclusions of Law

These adversary proceedings came before me for a consolidated trial on October 7th and 8th of 2009. Plaintiff Sonya Salkin, as Chapter 7 Trustee for Maxko Petroleum, LLC (hereinafter, "Plaintiff Salkin") filed separate proceedings against Defendants Palm Beach International, Inc. ("PBI") and its principal Aabash Pradhan (collectively with PBI, the "PBI Defendants") and Henri Hage ("Defendant Hage"), but the gravamen of the Plaintiff's claims are virtually identical. Plaintiff Salkin alleges that these Defendants, who were the respective high bidder and back-up bidder at a September 16, 2008 court-ordered auction, breached their purchase and sale contracts executed at the conclusion of the auction by failing to post required additional deposit monies and close on the transactions. As a result, Plaintiff Salkin is seeking damages against the PBI Defendants and Defendant Hage in amounts exceeding $1.2 million, plus interest.

Although the factual circumstances underlying the PBI Defendants' and Defendant Hage's involvement in the auction are different, and the PBI Defendants have alleged that Hage colluded with the Debtor to drive up the bid price at the auction, both the PBI Defendants and Defendant Hage asserted other defenses and affirmative claims against Plaintiff Salkin which made a consolidated trial appropriate. Specifically, the Defendants allege that the Debtor and the court-approved auction company misrepresented the nature of the assets being sold at auction. Additionally, the Defendants have also alleged that even if they are found liable for breaching

their respective purchase and sale contracts, the damages for which they are liable are capped at $100,000 as liquidated damages.

Having considered the operative pleadings filed by the parties in both Adversary Proceedings, the testimony of the various witnesses presented live, through deposition and videotape, and having admitted Joint Exhibits 1 through 89 (with the exceptions noted on the record), I now enter these Findings of Fact and Conclusions of Law.  A separate final judgment will be entered pursuant to Fed. R. Bankr. P. 7054 and 9021 in favor of Plaintiff Sonya Salkin, as Chapter 7 Trustee, and against Defendants Palm Beach International, Inc. and Aabash Pradhan[1] in Adversary Proceeding 08-01833-JKO, and against Defendant Henri Hage in Adversary Proceeding 08-01862-JKO.

### Findings of Fact

### 1.  Maxko's Chapter 11  Filing

These Adversary Proceedings emanate from the bankruptcy case of Maxko Petroleum, LLC ("Maxko" or the "Debtor"), which filed a Voluntary Petition for Relief under Chapter 11 of the United States Bankruptcy Code on April 16, 2008.  Maxko was a Florida limited liability company whose member interests were owned by Theodora Maxakoulis, but whose business was actually directed by her son William ("Bill") Maxakoulis. Prior to filing bankruptcy, Maxko was the owner of property and improvements in Sunrise, Florida, on which was operated a Chevron gas station, convenience store and pizza restaurant.

One of the main points of contention in these Proceedings arises from the existence of an entity called Sunrise Chevron, Inc. ("Sunrise Chevron"), which was owned by members of the Maxakoulis family, including Bill Maxakoulis.  Sunrise Chevron was the entity which *operated*

---

[1]	Defendant Pradhan is sued as a "guarantor" of Defendant Palm Beach International's obligations under its purchase and sale contract.

3

the gas station, as distinct from Maxko, which owned the real property, improvements, and fixtures thereon.

Testimony established that the Maxakoulis family's division of operation/ownership is common in the industry.[2] However, for purposes of this Chapter 11 case, it was agreed and ordered that the income and operations of both Maxko and Sunrise Chevron would be treated as one. Ex. 2 at 4.

The Trustee's sale of the property was most directly precipitated by the inability of Maxko to deliver the court-ordered adequate protection payments to Regions Bank to forestall Regions' foreclosure of the property. Ex. 2 at ¶ 7.  Due to Maxko's inability to make these payments, I entered the *Final Cash Collateral Order*, which includes the following language:

> That in the event the Debtor has not entered into a binding purchase and sale contract, providing for a deposit of not less than 10%, on or before July 15, 2008, the Debtor shall file with the Court a motion to sell by auction the Debtor's **real and personal property (including the business operations conducted by Sunrise Chevron, Inc. at such real property)**, with such auction to have a minimum reserve price of $4 million, which reserve may be increased by mutual agreement of the Debtor and Regions, and to be conducted by a mutually agreeable auctioneer to be approved by the Court.

Ex. 2 at ¶ 16 (emphasis added).

## 2.  The Auction Sale Process

Because Maxko was unable to meet the requirements of a private sale, on July 31, 2008, it filed its *Debtor's Motion for Order (I) Establishing Bidding Procedures; (II) Approving Form of Purchase Agreement; (III) Approving Form and Manner of Notices; (IV) Scheduling Auction and Final Approval of Sale; and (V) Authorizing Sale of Real and Personal Property Pursuant to*

---

[2]        Pradhan Tr. 358:4-9; Steubing Tr. 471:23 - 427:14            .

*11 U.S.C. § 363 and 365* (the "*Bidding Procedures Motion*"). Ex. 39. Paragraphs 6 and 7 of the

*Bidding Procedures Motion* recited as follows:

> The Debtor is a Florida limited liability company that owns and operates a Chevron gas station located at 10300 West Commercial Blvd., Sunrise, Florida (the "Real Property").
>
> The Debtor also operates a car wash, sandwich shop/bakery and convenience store on the Real Property **through an affiliated entity named Sunrise Chevron, Inc.,** although the Debtor does not collect any rental income from such entity.  The Debtor also collects rental income from a third party pizza delivery business which operates on the Real Property.

Ex. 3 at 2 (emphasis added).  The *Bidding Procedures Motion* further recited at paragraph 12:

> Accordingly, in order **to obtain maximum value for the Real Property, the personal property located thereon and the business operations conducted by Sunrise Chevron, Inc**. at the Real Property (collectively the "Property"), the Debtor and Regions have selected a mutually agreeable auctioneer and are seeking this Court's approval of same contemporaneous with the filing of this motion.

Ex.  3 at 3 (emphasis added).

While counsel for Regions Bank was responsible for the first draft of the motion, Attorney Lasky (counsel to Maxko as Debtor in Possession) testified that the filed *Bidding Procedures Motion* and other Court pleadings relating to the sale was the product of collaborative efforts by both Regions Bank's counsel and her. Lasky Tr. 159:1-160:4.  These pleadings demonstrate that the existence and role of Sunrise Chevron was clearly noted for the Court as well as any interested parties.

On August 15, 2008, I entered an *Order (I) Establishing Bidding Procedures; (II) Approving Form of Purchase Agreement; (III) Approving Form and Manner of Notices; (IV) Scheduling Auction and Final Approval of Sale*  (the "*Bid Procedures Order*").  Ex. 4.  That

form of Purchase Contract, which was eventually executed by both sets of Defendants, contained

the following provision:

> DAMAGES FOR PURCHASER'S BREACH. In the event of default by PURCHASER in the consummation of the purchase of PROPERTY in accordance with the terms of this CONTRACT, the deposit and interest accrued thereon shall be forfeited to SELLER. In addition, **SELLER reserves the right to pursue any and all legal remedies available at law or equity including the right** to maintain an action for specific performance or **to have PROPERTY resold at the risk and expense of PURCHASER**.

Ex. 4 at 10 (emphasis added).  But the *Bid Procedures Order* contained the following provision,

leading to the dispute over whether the Defendants' liability is limited to a forfeit of their

deposits:

> Following the Final Sale Hearing approving the Sale to the Successful Bidder, **if such Successful Bidder fails to consummate the sale** because of a breach or failure to perform on the part of such Successful Bidder, **any and all of the deposit(s) of the successful Bidder shall be forfeited and retained by the Debtor as an agreed upon liquidated damages** and shall not deemed a penalty and the Backup Bid, as disclosed at the Final Sale Hearing, will be deemed to be accepted and the Debtor will be authorized, but not required, to consummate the Sale with the Backup Bidder submitting such bid without further order of the Bankruptcy Court.

Ex. 4 at ¶ 2(i) (emphasis added).  It is this provision upon which Defendants rely in claiming

that Plaintiff Salkin is limited to recovery, if at all, of only the $100,000 initial deposit.  For the

reasons which are set forth more fully below, I disagree and holds that Plaintiff Salkin may

recover the full extent of damages incurred by the estate.

    While it was obtaining authority to conduct an auction sale, Maxko simultaneously

obtained Court authority to retain the auction company, GoIndustry Dovebid, to conduct the

auction.  GoIndustry began advertising for the auction by sending out a flyer which identified

that the property ("Modern Convenience Store, Gas Station and Car Wash on 2.20 +/- Acres")

was being sold pursuant to bankruptcy court order and further provided:

> **PROPERTY CONDITION**: The property is being sold in an "AS IS" condition with no warranties, guarantees or representations of any kind.  Information in this brochure has been obtained from sources believed to be accurate but is not guaranteed.  Your complete inspection of the property and substantiating documents is advised.

Ex. 32:52.

GoIndustry further advertised the auction sale on its website.  The parties are not entirely

in agreement on what information was available on the GoIndustry website prior to the auction

sale.  However, based upon the testimony of GoIndustry representatives, Fox, Fiegel and

Goldberg, it is evident that among the documents available for review by any interested parties

was an approximately thirty eight page "Property Information Package" which was also

distributed on the day of the auction. Ex. 21; Fiegel Tr. 267:14-268:7, Fox Tr. 229:1-12.  That

Property Information Package included information on the property being auctioned, a broker

registration form, a copy of the *Bid Procedures Order* and a copy of the "Purchase Contract"

which bidders would be required to execute at the conclusion of the sale.

The Executive Summary, being the fifth page of the Property Information Package,

specifically identified the property being sold as:

> **PROPERTY DESCRIPTION**: 4,800± sq. ft. convenience store, five (5) pump islands with 3,836± sq. ft. fuel island canopy and 800± sq. ft. car wash.

Ex. 21:5.  Moreover, the Property Information Package contained a disclaimer which notified

interested parties that:

## NOTICE TO ALL BIDDERS

The information included herewith is a summary of information available from a number of sources, most of which have not been independently verified. This summary has been provided only for the use of prospective bidders at the Public Auction to be held on Tuesday, September 16 at 10:00 A.M. (EDT). It is supplied for whatever assistance it may provide in answering questions; however:

SUCH INFORMATION AND OPINIONS ARE SUPPLIED WITHOUT ANY WARRANTIES OR REPRESENTATIONS, EITHER EXPRESED OR IMPLIED WHATSOEVER.

Prospective bidders are advised to avail themselves of the land and tax records of the City of Sunrise, Broward County and the State of Florida and to make an inspection of the premises on their own behalf, consulting whatever advisors they may feel appropriate.

The property for sale will be auctioned in an "AS IS", "WHERE IS" condition and neither GoIndustry-DoveBid, nor the Seller or their respective agents make any express or implied warranties of any kind. The description and conditions listed in this and other advertising materials are to be used as guidelines only and are not guaranteed.

Ex. 21:2.

GoIndustry also made available on its website at least one appraisal of $4.65 million which GoIndustry had obtained through Regions Bank. Although PBI defendants claim that a higher appraisal of $6 million (on which PBI alleges it relied) had also been made available, this is irrelevant to the matter at hand since GoIndustry made clear that neither the Debtor nor GoIndustry were representing the accuracy or propriety of such information. Ex. 21:2.

### 3.  The PBI Defendants' Involvement

Defendant Pradhan testified that he first became aware of the Maxko auction sale in late August, 2008, after having received a copy of the advertising flyer sent out by GoIndustry. At this time, the PBI Defendants already had extensive experience in gas station ownership and

operations through Pradhan's involvement in the ownership and/or operation of between six and eight gas stations. Additionally, Pradhan testified that it was common in the industry for another entity to actually conduct a gas station's operations. Pradhan Tr. 358:4-9.  Accordingly, the PBI Defendants were aware of the common bifurcation between ownership and operations in the gas station business.

Defendant Pradhan also testified as to what documents were made available for his review on the GoIndustry website, such as the above-mentioned appraisals and Property Information Package.  There is no real issue on this point since the Defendants are bound by the Notice to All Bidders, as well as by the language in the purchase contract subsequently incorporated into court order.

### 4.  Hage's Involvement

The circumstances surrounding how Defendant Hage became the back-up bidder at the September 16, 2008, are certainly curious.  Both Hage and Bill Maxakoulis testified that Hage first learned about the sale from his friend, Bill Maxakoulis.  Hage testified that upon learning of the auction sale and deciding to bid, he neither visited the GoIndustry website nor reviewed any other documentation pertaining to the auction sale or gas station prior to actually bidding at the auction sale on September 16. Hage Tr. 116:18-117:4.  Hage also did not request from Maxakoulis, and Maxakoulis did not provide to Hage, any information or documentation concerning the gas station.  Hage Tr. 95:13-19, 96:12-18; Maxakoulis Dep. 52:25-53:3.

 Hage apparently wished to be excused from his obligation because he claims he had limited opportunity to review the Property Information Package which included the Purchase Contract.  This is irrelevant.  At best, Hage chose to enter into an agreement without conducting

due diligence, and such absence of diligence does not nullify Hage's obligations as a signatory to the Purchase Contract.

## 5.  The Auction

The auction sale of the station was conducted at the station site on the morning of Tuesday, September 16, 2008.  It was well attended and there were eight or nine bidders who were given bidding numbers by GoIndustry (after providing a $100,000 check making them eligible to bid).  Upon registering, each bidder was provided with the Property Information Package. Ex. 21.

Defendant Hage testified that he drove to the auction with Bill Maxakoulis. Hage Tr. 35:5-14.  According to Hage, he and Maxakoulis had no discussion of the property and the merits of bidding at the auction sale. Hage Tr. 35:15-27.  Hage had apparently already made up his mind to bid at the auction sale and had determined that he would bid in the range of $2.5 million to $3.2 million. Hage Tr. 124:6-125:5.  Although Hage also admitted to receiving the Property Information Package from GoIndustry upon registering at the auction, he was emphatic that he did not read, or even skim, the documents prior to commencement of the bidding. Hage Tr. 121:14-122:2.[3]   Rather, according to Hage, he bid solely based upon the announcements made by the auctioneer David Fox at the commencement of the auction.  Hage Tr. 122:16-123:12.  These announcements included some of the same disclaimers found in the Property Information Packet.

Although a court reporter was not at the auction to transcribe the proceedings, an audio recording of the auction was made by David Fiegel of GoIndustry and played at trial. Ex. 85; Tr. 230:19-249:23. Following a few preliminary comments, Fox announced the following:  **"Now**

---

[3]      Hage also testified that he had not gone on the GoIndustry website prior to such auction and in fact was not aware there was one. Hage Tr. 107:18-108:3.

folks, we are selling real estate here today. The building and the land. We are not selling inventory, we are not selling stocks, we are not selling gas. You are not buying those three items; you are not buying inventory, stock and gas. If the fixtures are owned by the station then they are. Some of the fixtures may be leased. You are buying the fixtures in the building, the counters and the racks if they're owned by the gas station." Tr. 232:11-16; Ex. 85. Fox then went on to read the "Notice to All Bidders" contained in the Property Information Package in its entirety. He also read from the *Bidding Procedures Order*, including the language contained in paragraph 2(i). There were inquiries from the audience as to both the Pizza Time restaurant lease and a gas supply agreement and answers, or at least comments to those questions, were provided by Attorney Lasky as well as (apparently) by Bill Maxakoulis, who was standing in the crowd.

Both Defendants Pradhan and Hage claimed at trial that the announcements made by the auctioneer confirmed to them that they were about to bid on all real and personal property located at the station site, other than inventory and stock located in the convenience store, and were getting a turnkey gas station operation. I do not find this testimony credible. Putting aside all of the disclaimers and cautionary language set forth in the GoIndustry materials as well as announced at the auction, I saw nothing in the Property Information Package provided to bidders or heard anything in the announcements made by Auctioneer Fox to justify finding that GoIndustry was warranting to prospective bidders that any and all personal property located at the property was included in the sale or that the successful purchaser could operate the business using that personal property. While there is no doubt that whatever could be sold along with the "building and the land" would be included in the purchase price, I do not find that the Defendants were misled as to what they were bidding on.

PBI Defendants have also accused Maxakoulis and Hage of effectively conspiring to drive up the bid price.  I cannot find evidence of such a conspiracy or even any definitive evidence as to whether anything was said at all between Hage and Maxakoulis during the auction.  But more importantly, given that Hage obligated himself under the sales contract as a back-up bidder and could have easily been the high bidder, I find no evidence of Hage bidding simply to drive up the price at auction.

What the evidence presented at trial did establish, however, is that the auction process accomplished its intended purpose. Both the PBI Defendants and Defendant Hage, perhaps caught up in the frenzy of the auction process and characterized by Pradhan as engaged in a "bidding war" with each other, Pradhan Tr. 398:25-399:14, chose to bid against each other well after other bidders chose to stop bidding, at amounts well in excess of those amounts which each acknowledged he was originally prepared to bid up to.  At the end of the bidding process, Defendant PBI stood as the high bidder at the auction submitting a high bid of $4.2 million which, with a 10% buyer's premium, constituted an effective purchase offer of $4,620,000.00. Defendant Hage followed right behind with an effective purchase offer of $4,565,000.00 as back-up bidder.

## 6.  Execution of Bid Acknowledgment and Purchase Contract

At the conclusion of the bidding, both the PBI Defendants and Defendant Hage, as the respective high and back-up bidders were requested by GoIndustry representatives to and did in fact go into the Pizza Time restaurant where they executed a Bid Acknowledgment form and the Purchase Contract.  The Bid Acknowledgment form executed by Pradhan, on behalf of PBI, provided as follows:

12

| High Bid | 4,200,000.00 |
|---|---|
| + | |
| **Buyers Premium** | 420,000.00 |
| = | |
| **Total Purchase Price** | 4,620,000.00 |

| **Required Deposit** | 462,000.00 |
|---|---|
| - | |
| **Initial Deposit** | **100,000.00** |
| = | |
| **Additional Deposit** | 362,000.00 |
| (due within two business days of the entry of the Sale Order) | |

Ex. 27 at 2. Parenthetically, the Bid Acknowledgment form also contained a disclaimer that "BIDDER…hereby warrants and represents that AUCTIONEER has not made any statement, representation or warranty regarding the condition of the premises, zoning conditions, governmental requirements or environmental matters, guarantees or warranties of the like, or any warranties whatsoever, upon which BIDDER has relied and is not contained in this receipt or related CONTRACT."

Contemporaneously with the execution of the Bid Acknowledgment, the PBI Defendants executed the Purchase Contract, which contained the following recital:

> WITNESSETH, that for and in consideration of the mutual covenants herein, SELLER agrees to sell and PURCHASER agrees to buy the property and the improvements thereon known as 10300 West Commercial Blvd., Fort Lauderdale, Fl 33351 in the County of Broward, and as more particularly described by an accurate survey and description, together with whatever personal property, furniture, fixtures and equipment so located and related to the operation of the business, (and specifically excluding any personal property, furniture, fixtures and equipment that may be the legal property of tenants) hereinafter referred to as PROPERTY, upon the following terms and conditions:

Ex. 28 at 2. The Purchase Contract further recited that that the "PURCHASE PRICE OF PROPERTY IS Four Million Four Hundred Sixty Thousand Dollars ($4,460,000)" and that an

"Additional Deposit in the amount of Three Hundred Sixty Two Thousand ($362,000) sufficient to bring the total deposit to 10% of the purchase price shall be paid in certified funds to AUCTIONEER not later than 5:00 P.M., September 18, 2008."  Upon a purchaser's breach, the Purchase Contract executed by the PBI Defendants provided "SELLER reserves the right to pursue any and all legal remedies available at law or equity including the right…to have PROPERTY resold at the risk and expense of PURCHASER."

Both defendants claim that the above description of the property being sold supports their defense that they were misled as to the property being sold and therefore should be released from liability under their respective Purchase Contracts.  I reject this assertion and point the Defendants to the contract's property description expressly qualifying the contractual language of "together with whatever personal property … so located and related to the operation of the business," with an exclusionary clause excepting "any personal property … that may be the legal property of tenants."  Defendant PBI repeatedly chose to truncate this contractual language in its proposed findings[4], including one instance where it substituted this exclusionary clause with an ellipsis.  I find it disappointing that Defendant PBI would then follow this ellipsis with an assertion that is directly refuted by the language it used the ellipsis to omit.  This willfully deceptive use of a grammatical mark directly resulted in my entertaining baseless arguments that the Debtor unilaterally changed the terms of the purchase contract in violation of Florida law.  After reviewing the record, I conclude that the purchase contracts and the pre-auction disclosures

---

[4] "The Initial Purchase Agreement specifically and unequivocally provides that PBI would receive, 'the property and the improvements thereon known as 10300 West Commercial Blvd., Fort Lauderdale, FL 33351 in the county of Broward, and as more particularly described by an accurate survey and description, *together with whatever personal property, furniture, fixtures, and equipment so located and related to the operation of the business*….'  However, as previously stated, immediately after executing the Initial Purchase Agreement, Pradhan learned from the Debtor's Principal that the Debtor could not, and would not, in fact, transfer any of the furniture, equipment and trade fixtures located on the Property and connected to the operation of the gas station convenience store, deli and car wash, because all of those items actually belonged to Sunrise Chevron instead of Maxco Petroleum." Def. PBI, Inc. Proposed Findings of Fact and Conclusions of Law (emphasis in original).

clearly provided that what was being sold was "as is, where is,' with no representations or warranties.

Defendant Hage similarly executed a Bid Acknowledgment form and Purchase Contract as the back-up bidder.  The Bid Acknowledgment form executed by Hage provided as follows:

| High Bid | 4,150,000.00 |
|---|---|
| + | |
| Buyers Premium | 415,000.00 |
| = | |
| Total Purchase Price | 4,565,000.00 |

| Required Deposit | 456,500.00 |
|---|---|
| - | |
| Initial Deposit | 100,000.00 |
| = | |
| Additional Deposit | 356,500.00 |
| (due within two business days of the entry of the Sale Order) | |

Ex. 29 at 2.  Hage also executed the Sales Contract, which was identical in form (except for the purchase price) to the Sale Contract executed by the PBI Defendants.  Hage clearly understood that, as the back-up bidder, he would be obligated to close as purchaser in the event that the PBI Defendants defaulted.  Hage Tr. 128:16-129:3.

### 7.  Post-Auction

After executing the Bid Acknowledgment form and Purchase Contract, Pradhan testified that he was approached by Bill Maxakoulis.  According to Pradhan, Maxakoulis identified himself as the property owner and advised that a related company, Sunrise Chevron, owned everything at the gas station other than the four walls and that Sunrise Chevron also had an operating agreement which allowed it to stay at the station after any sale.  Pradhan Tr. 410:5-22.  According to Pradhan, Maxakoulis also told him that a $4.65 million appraisal of the property had been put on the GoIndustry website just prior to the sale.  Pradhan Tr. 324:10-12, 412:25-

413:5.  Pradhan claims that a $6 million appraisal was originally posted on the website and that he relied on that appraisal in seeking financing and deciding to bid on the property.  This post-auction statement by Maxakoulis therefore "shocked" Pradhan. Pradhan Tr. 415:7-10.

The PBI Defendants claim that these disclosures by Maxakoulis caused them to realize that they were not getting what they thought, justifying not performing their obligations under the Purchase Contract.  But if the Defendants were so shocked at this revelation, they did not express any concerns at the hearing to approve and confirm the sale held but sixty to ninety minutes later that day.  In fact, I inquired of Defendant Pradhan, who was present as the successful high bidder, "Anything you want to tell me?" Ex. 6:9/23.  In response, Pradhan first advised me of his concern about the registration of his broker.  Thereafter, Pradhan made the following statements:

> And the other thing, actually the bid went pretty good, and were around, like, $2.7 million while bidding, and one thing I noticed is like the second highest bidder happened to be a friend of the owner, but whenever they were making bids, they were asking the owner.
>
> First of all, I didn't know it was the owner, and the bid was going on, and then later on this guy comes to me and tells me, like, "He's the owner," so I was surprised.  That's the only thing I didn't feel good about, because the owner is the one who is making the - - this is an entity, okay, raise it, so that's the only thing, sir, and I just wanted to tell what I have inside.

Ex. 6:10/16.  That Pradhan admitted that the bidding process "went pretty good" and that his discomfort about Maxakoulis speaking with Hage was the "only thing I didn't feel good about" speaks volumes.  Further, it was announced at the beginning of the auction that the property appraised at $4.65 million.[5] Ex. 6:13/7.  As such, I find that Maxakoulis' statements had no

---

[5]    Defendant Hage also testified that the existence of a $4.65 million appraisal was disclosed prior to the auction.  Hage Tr. 108:23-109:2.

effect on the PBI Defendants' decision to not post the required additional deposit monies or close under the purchase and sale contract.

Hage also claims that he was shocked to learn that there was an operating agreement in favor of Sunrise Chevron. Nevertheless, I find that Hage was not prepared to perform under his purchase contract as a back-up bidder regardless of the existence of an operating agreement with Sunrise Chevron.

### 8.  The PBI Defendants and Defendant Hage Default

Following or contemporaneous with his meeting with Hage and Maxakoulis, Defendant Pradhan actually made the decision not to post the additional deposit and thus default under the PBI Defendants' Purchase Contract. At trial, Pradhan claimed that his decision not to post the additional deposit and default was due to learning from Maxakoulis that he had been misled at the September 16 auction sale into thinking he was purchasing personal property and pumps at the station.[6] Pradhan justified his prolonged silence on these concerns by claiming he wanted to conduct a further investigation. I find that no such investigation to determine the veracity of Maxakoulis' statements was ever conducted.

Immediately after sending a default letter to the PBI Defendants, Attorney Lasky sent correspondence to Defendant Hage advising that due to the default of the high bidder, Hage would be required to post the additional deposit by September 23, 2008 and close under his sale contract. Ex. 39. Hage responded to this letter through his then counsel, Arthur Neiwirth, who claimed in correspondence dated September 23, 2008 that the "sale was misleading and improper

---

[6]     As noted above, this testimony was impeached by Pradhan's deposition testimony, in which he conceded that this information was not a relevant factor in his decision to default, which was motivated by his purportedly learning about the $4.65 million Hopkins appraisal.

and my client did not understand the need to hire counsel." Ex. 66:1.[7]  Attorney Neiwirth further claimed in his correspondence that the "[b]uyers were not aware of the extent that they were or were not buying a business that was capable of being operated," and made demand for "immediate refund to my client of the $100,000.00 deposit currently being held." Ex. 66:2. Defendant Hage did not post the additional deposit monies necessary to bring his deposit up to 10% of his $4.565 million offer and similarly defaulted under his Purchase Contract.

As a result of the PBI Defendants' and Defendant Hage's defaults under their respective purchase contracts, Attorney Lasky filed a motion on behalf of the Debtor to confirm the forfeiture of the $100,000 initial deposits which had been posted by the Defendants to qualify them to bid. Ex. 8. The motion specifically referenced the provision in each Contract titled "DAMAGES FOR PURCHASER'S BREACH," which provided that, in addition to the forfeiture of deposit monies, the Debtor reserved the right to "have PROPERTY resold at the risk and expense of PURCHASER."   The failed auction and the filing of the Debtor's forfeiture motion were the Debtor's last acts as debtor in possession.

The hearing on the forfeiture motion was conducted November 6, 2008. Although Defendant Hage filed a written opposition and opposed the requested relief at such hearing, the PBI Defendants neither filed a pleading in response to such motion nor appeared in court. Accordingly, on November 12, 2008, I entered an *Order Granting Motion to Confirm Forfeiture of Deposits as to Palm Beach International, Inc.*, which granted the forfeiture motion as to PBI only and deemed the initial deposit of $100,000 posted by the PBI Defendants as forfeited to the estate. Ex. 14 at 2.  Specifically and by agreement, the *Order* did not resolve the motion as to

---

[7]     Attorney Neiwirth also claimed in his correspondence that Defendant Hage "did not fully appreciate the ramifications of being a back-up bidder." Ex. 66: 2.  This assertion was belied by Hage's trial testimony that he fully understood his role and obligations as a back-up bidder.  Hage Tr. 128:16-129:3.

Defendant Hage, and issues raised in that motion were consolidated with the adversary proceedings for trial.

### 9.  Plaintiff Salkin's Re-Auction

Following the filing of a motion to convert by Regions Bank, I entered an *Order Converting Case Under Chapter 11 to Case Under Chapter 7* on October 8, 2008 (Ex. 9) and Plaintiff Salkin was appointed Chapter 7 Trustee. Ex. 10.  Shortly after her appointment, Plaintiff Salkin filed a joinder in the Debtor's previously filed forfeiture motion (Ex. 12) and contemporaneously filed her *Trustee's Motion for Order: (i) Establishing Bidding Procedures; (ii) Approving Form of Purchase Agreement; (iii) Approving Form and Manner of Notice; (iv) Scheduling Auction and Final Approval of Sale; and (v) Authorizing Sale of Real and Personal Property Pursuant to 11 U.S.C. § 363 and 365* (the *"Trustee's Bid Procedure Motion"*). Ex. 11.

Through the *Trustee's Bid Procedures Motion*, Plaintiff Salkin sought authority to sell the Debtor's "Property" at a second auction.  Given the disputes and issues arising from the first auction, she also filed a *Supplement* to the *Bid Procedures Motion* on October 29, 2008. Ex. 13. Paragraph 2 of the *Supplement* stated:

> Although the Trustee believes that the description of the property in the *Bidding Procedures Motion* was complete, in an abundance of caution the Trustee makes the following further description of the property to be sold: The property to be sold includes only real estate and buildings thereon, and does not include the furniture, store fixtures, equipment, inventory and supplies located in or on the property.

Ex. 13 at 1.  On November 13, 2008, I entered an *Order (I) Establishing Bidding Procedures; (II) Approving Form of Purchase Agreement; (III) Approving Form and Manner of Notices; (IV) Scheduling Trustee's Auction and Final Approval of Sale* (the *"Trustee's Bid Procedures Order"*).  Ex. 5.

The *Trustee's Bid Procedures Order* approved the form of purchase contract attached as Exhibit B to that *Order*. The Purchase Contract, consistent with Plaintiff Salkin's *Supplement* to the *Trustee's Bid Procedures Motion* recited that the property being sold and purchased was the "property and the improvements thereon known as 10300 West Commercial Blvd., Fort Lauderdale, Florida…." Ex. 15:8. Both the PBI Defendants and Defendant Hage point to the difference in this language from the language contained in the purchase contract originally approved in connection with the first auction as evidence of their being misled as to what was being sold at the September 16 auction. I do not find this to be the case. That Plaintiff Salkin, walking into this converted case somewhat in the blind and viewing the events arising from the failed auction, chose to pursue a more conservative approach to a second sale does not excuse the Defendants from their obligations under their respective purchase contracts, especially considering the documentation in its entirety and the very clear oral warnings given by the auctioneer over the loudspeaker.

The second court-approved auction went forward on December 8, 2008. At this sale, a high bid of $3,050,000 was submitted by Hunter W. Chambliss for a total purchase price of $3,355,000, inclusive of the 10% buyer's premium. That sale (which did close) was approved by my *Order Confirming and Approving Trustee's Sale of Real Property Free and Clear of Liens, Claims and Encumbrances* entered on December 9, 2008. Ex. 16. On December 18, 2008, I entered an *Agreed Order Granting Plaintiff's Emergency Motion for Preliminary Injunction Without Notice and For Preliminary Injunction* which provided that "**all other property of any kind located on the Real Property, including the gasoline tanks and fuel dispensers, belongs to the estate of Maxko Petroleum, LLC**." *Id.* (emphasis added). Additionally, for the sum of $50,000, the successful bidder at the December 8, 2008 auction acquired the very same gas

20

station equipment (slushee machines and the like) which had ostensibly confounded the first auction. Maxakoulis Dep. 104:13-22. To the extent that the PBI Defendants and Defendant Hage contend that Sunrise Chevron's claimed ownership of the tanks and dispensers was a significant factor in their decisions to not honor their bids, the subsequent resolution of the same issues with Mr. Chambliss is an illuminating though not dispositive chain of events which tend to undermine the credibility of the Defendants' assertions. After evaluating the conduct of the Defendants on the stand and the facts surrounding their actions, it seems clear that they simply concluded (after the fact) that they got caught up in a bidding frenzy and bid more than they wish they had.

Plaintiff Salkin also addressed Bill Maxakoulis' claim regarding the existence of an Operating Agreement[8] when she filed her *Emergency Motion to Reject Alleged Operating Agreement and Emergency Motion to Compel Turnover of Real and Personal Property* on December 10, 2008. Ex. 17. That *Emergency Motion* was granted by my *Order Granting Trustee's Emergency Motion to Reject Alleged Operating Agreement and Emergency Motion to Compel Turnover of Real and Personal Property* dated December 16, 2008. Ex. 18. Finding that the "Operating Agreement does not grant exclusive possession, does not state a term of years, and does not provide for payment of rent," I approved Plaintiff Salkin's rejection of the agreement without making "any determination whether the Operating Agreement is valid and unavoidable" in the first instance. Ex. 18 at 2-3.

Irrespective of what Bill Maxakoulis said on behalf of Sunrise Chevron, neither the PBI Defendants nor Defendant Hage ever permitted me or interested parties in the case to address such assertions prior to taking positions that they would not honor their bids. Only after the PBI

---

[8]    Maxakoulis produced this Agreement for the first time at his 2004 examination conducted in December, 2008. Lasky Tr. 179:22-180:17.

Defendants defaulted under their purchase contract and Defendant Hage was put on notice of his obligation to post his additional deposit did these parties (seeking to avoid substantial liability for their defaults) claim that the auction was not conducted properly. If these parties actually had any intention of closing and had brought before me the purported matters raised by Maxakoulis, they would have learned that while Sunrise Chevron claimed ownership of everything at the station including the gas pumps, walk in refrigerators, etc., (i) it was agreed, ordered, and represented at the inception of the case that the operations of Maxko and Sunrise Chevron would be treated as one, (ii) the gas station pumps and canopies, walk in refrigerators and certain other fixtures at the station were property of the Debtor irrespective of anything Bill Maxakoulis had to say, as later events in the case established, and (iii) the purported operating agreement, which Maxakoulis never produced until well after the auction and whose authenticity was dubious at best could have been rejected, as it subsequently was, in the bankruptcy. The evidence is clear to me that the Defendants' motivation in defaulting was the result of their recognizing that they had bid too high. This is a classic case of buyer's remorse, for which neither the law nor equity will provide a safe haven.

## Conclusions of Law

### I.    JURISDICTION

I have subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) because both adversary proceedings are civil proceedings arising in or related to a case under the Bankruptcy Code. I also have jurisdiction under 28 U.S.C. § 1334(e) because the adversary proceedings involve property of the Debtor's estate.

I find that these are core proceedings pursuant to 28 U.S.C. §157(b)(2)(A), (N) and (O). Defendant Hage has denied that that this is a core proceeding, but I disagree. As these

proceedings arise from orders providing for the disposition of estate property and the *Bid Procedure Order* and *Final Sale Order* specifically provide that I retains jurisdiction to enforce and construe the orders and purchase contracts, I find that I have authority to enter final judgments in each adversary proceeding. *See Baldridge v. Smith (In re Brown),* 67 B.R. 635, 637-38 (Bankr. E.D. Ark. 1986) (action against delinquent purchaser at bankruptcy sale is a "core" proceeding).

## II.    PLAINTIFF SALKIN HAS ESTABLISHED A PRIMA FACIE CASE FOR BREACH OF CONTRACT

Prior to the commencement of trial, the PBI Defendants, Defendant Hage and Plaintiff Salkin stipulated that Plaintiff Salkin had made a prima facie case on her claims for breach of contract set forth in both Adversary Proceedings. Tr. 9:8-10:9. By reason of the parties' stipulation, I concluded that Plaintiff Salkin has established the elements of her claim for breach of contract. *AIB Mortgage Co. v. Sweeney,* 687 So. 2d 68, 69 (Fla. 3d DCA 1997) ("To establish a breach of contract, a party must show the existence of a contract, a breach thereof, and damages."); s*ee also Murciano v. Garcia,* 958 So. 2d 423, 423 (Fla. 3d DCA 2007). Accordingly, it was accepted at trial that Plaintiff Salkin had met her burden of going forward and establishing by a preponderance of the evidence that: (i) the PBI Defendants and Defendant Hage were parties to valid and enforceable purchase and sale contracts; (ii) the Defendants breached these contracts by failing to post additional deposit monies as required by such contracts and failing to close under such contracts; and (iii) as a result of such breaches the Debtor's estate incurred damages which Plaintiff Salkin contends, as to the PBI Defendants, is the difference between the $4,620,000 bid made by these Defendants and the $3,355,000 sale price paid by Hunter Chambliss after the December 8th re-auction and, as to Defendant Hage, is

the difference between his $4,565,000 bid and the $3,355,000 sale price paid by Hunter Chambliss.

## III.    DEFENDANTS' DEFENSES AND AFFIRMATIVE CLAIMS

At trial, the PBI Defendants and Defendant Hage presented evidence as to the affirmative defenses and counterclaims asserted by each. These defenses and counterclaims can be fairly summarized as follows: (i) the Debtor and auctioneer misrepresented the nature of the assets being sold at the September 16, 2008 auction sale and/or failed to disclose material information, such that Defendants should not be bound by their respective Purchase Contracts; (ii) the Debtor, as seller, was unable to sell or transfer all of the property described in the Purchase Contracts such that there was an anticipatory breach by the Debtor; (iii) even if the Defendants breached their Purchase Contracts, the sole remedy of the Debtor (and therefore Plaintiff Salkin) was forfeiture and retention of the parties' initial deposits of $100,000 as liquidated damages; and (iv) as the Debtor and Plaintiff Salkin sold different assets at the September 16 and December 8 auction sales, Plaintiff Salkin is unable to establish quantifiable damages.  The PBI Defendants have also asserted as a defense that they should not be held liable due to the fraud and collusion of Bill Maxakoulis and Defendant Hage during the bidding process.

In analyzing the defenses and affirmative claims of both the PBI Defendants and Defendant Hage, I am mindful of the fundamental policy favoring finality in judicial sales. *See In re Winston Inn & Restaurant Corp.*, 120 B.R. 631, 635 (E.D.N.Y.  1990) ("public policy requires stability in bankruptcy sales."). *See, e.g., Jarecki v. Pennsylvania Unemployment Compensation Fund (In re Jarecki)*, 202 B.R. 385 (W.D. Pa. 1995), *aff'd,* 103 F.3d 113 (3d Cir. 1996) (district court affirmed bankruptcy court's order compelling debtor to sell property to successful bidder at sale); *Silverman v. Ankari (In re Oyster Bay Cove, Ltd.)*, 196 B.R. 251, 254 (E.D.N.Y. 1996).  The doctrine of "caveat emptor" imposes a heavy burden on a prospective

24

purchaser seeking to be excused from the ramifications of such sale. *See In re Laughinghouse*, 51 B.R. 869, 876 (Bankr. E.D.N.C. 1985) (citing *Slaughter's Administrator v. Gerson*, 80 U.S. 379 (1871) ("A court of equity will not undertake, any more than a court of law, to relieve a party from the consequences of his own inattention and carelessness. Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's misrepresentations.")

### A.    DEFENDANTS' DEFENSES/CLAIMS OF MISREPRESENTATION

Both the PBI Defendants and Defendant Hage contend that they were fraudulently induced to bid at the September 16 auction.  Specifically, these Defendants contend that had the Debtor and auction company disclosed that a non-debtor entity, Sunrise Chevron, owned all of the personal property at the station, including the gas tanks and dispensers, which was not part of the auction and that Sunrise Chevron had an operating agreement which permitted it to operate the gas station irrespective of the sale, they would have never bid at the auction.  In doing so, the Defendants claim that the Debtor and auction company fraudulently misrepresented the assets being sold and misled bidders into believing they were buying a turnkey gas station operation.

In order to prove fraud, a claimant must establish that: a false statement was made regarding a material fact; the individual who made the statement knew or should have known that it was false; the maker intended that the other party rely on the statement; and the other party relied on the false statement to its detriment. *Brooks Tropicals, Inc. v. Acosta*, 959 So. 2d 288, 294-95 (Fla. 3d DCA 2007); *see also Lance v. Wade*, 457 So. 2d 1008, 1011 (Fla. 1984); *American International Land Corp. v. Hanna*, 323 So. 2d 567, 569 (Fla. 1975). Applying these elements to the evidence presented at trial, the PBI Defendants and Defendant Hage fail to

demonstrate that they were fraudulently induced to bid at the September 16th auction or that the auction process was tainted with fraud.

As previously addressed, the flyer, property information package, and announcements all put the defendants on notice that no warranties were being made by either the Debtor or GoIndustry regarding the accuracy of any information being provided.  Further, Defendant Hage chose not to read the written materials provided by GoIndustry or any of the pleadings provided in the Property Information Package. While a lack of diligence is not a defense, Hage claims that he relied on the announcements made by David Fox at the commencement of the auction and was led to believe from those announcements that he was buying a turnkey operation.  These announcements were recorded and played into the record during trial.  I cannot find any statement made by Auctioneer Fox which could be viewed as an affirmative misrepresentation of fact.  Rather, at the inception of the auction, Fox announced: "Now folks, we are selling real estate here today.  The building and the land." Fox Tr. 232:11-12.  Fox then went on to clarify based upon a statement made by an unidentified speaker in the crowd that "fixtures" would also be included if "owned by the station." Fox Tr. 232:17-22.  Fox further read from the "Notice to Bidders" found in the Property Information Package which contained a page full of disclaimers. Fox Tr. 239:12 to 240:11. In considering the totality of the evidence presented at trial, this Court cannot conclude that the PBI Defendants and Defendant Hage were the victims of misleading and fraudulent statements of fact made by the Debtor or the auction company, much less reasonably relied on such statements.

Supporting this conclusion is *Winston Inn & Restaurant Corp. v. DeMichiel (In re Winston Inn & Restaurant Corp.)*, 120 B.R. 631 (E.D.N.Y. 1990). In that case, the district court

26

rejected a defaulting bidder's argument that uncertainty as to what equipment was actually being transferred with restaurant property negated the bidder's obligation to close.

> [T]he court is unpersuaded by defendants' argument that, because the judicial sale left unresolved certain questions about what equipment would be transferred with the restaurant business, no agreement was binding until these matters were settled. The law has long cautioned buyers at judicial sales that they bid at their own risk as to the fair value of the property offered. To allow purchasers to bid hundreds of thousands of dollars before a court, to have lienholders agree to the bid, and then to have the purchasers renege upon further inquiry into the nature of the property, would interject an intolerable element of uncertainty and inequity into judicial sales. It would give an advantage to those who blithely bid in ignorance at the expense of those who have made more careful inquiry into the reasonable value of the property offered for sale. Moreover, it could deprive the debtor and lienholders of the benefit of an offer made by a more serious bidder.

*Id*. at 636-37 (internal citation omitted).

Additionally, the PBI Defendants and Defendant Hage were sophisticated parties who should have been aware of the risks inherent in this type of sale as well as the issues which they needed to investigate prior to the sale. *Balaber-Strauss v. Markowitz* (*In re Frankel*), 191 B.R. 564, 570 (Bankr. S.D.N.Y. 1995) (vacated in part on other grounds). The PBI Defendants owned and operated gas stations and Defendant Hage was a sophisticated businessman who had acquired other properties and previously explored the potential acquisition of gas station properties. Pradhan Tr. 358:4-9[9]; Hage Tr. 85:12-16. That none of the defendants chose to exercise their full abilities as sophisticated buyers is a decision for which they must respectively bear the consequences.

Finally, Defendant Hage's Proposed Findings inform me that:

---

[9]    In fact, with respect to the two gas stations owned by Defendant PBI, different entities owned by Defendant Pradhan operated such stations, reflecting an identical severance of ownership and operation which testimony established is common in the industry.  Pradhan Tr. 357:1-24.

> . . . to constitute remediable fraud, it must appear that the reliance placed on the representation by the other party was **justified under the circumstances**. *Fote v. Reitano*, 46 So. 2d 891 (Fla. 1950); *Butts v. Dragstream*, 349 So. 2d 1205 (Fla. 1st DCA 1977). In other words, the party to whom the representation is made must not only [have] believed it to be true but also must be **so situated with respect to what is represented as to have the right to depend on the truth** of the statement. *Morris v. Ingraffia*, 154 Fla. 432, 18 So. 2d 1 (1944).

Def. Hage Proposed Findings of Fact and Conclusions of Law (emphasis in original). In light of the numerous disclaimers of no warranty, the Defendants' reliance is neither justified, nor accompanied by a right to depend on the alleged representations as truth.

## B.    DEFENDANTS' DEFENSE OF MISTAKE

In order for a trial court to reform a contract or excuse a party from performance, the evidence must clearly and convincingly show a mutual mistake of fact as to a material, substantial element of a contract. *Williams, Salomon, Kanner, Damian, Weissler & Brooks v. Harbour Clubs Villas Condominium Association, Inc.*, 436 So. 2d 233, 235 (Fla. 3d DCA 1983); *Canal Ins. Co. v. Hartford Ins. Co.*, 415 So. 2d 1295, 1297 (Fla. 1st DCA 1982), *rev. denied*, 424 So. 2d 761 (Fla. 1983). A mistake as to mere inducement does not provide such justification. *Harbour Clubs Villas,* 436 So. 2d at 235. Moreover, the law will not permit a party to assert a defense of mistake if the mistake results from an inexcusable lack of due care or the other party has detrimentally relied on the contract such that it would be inequitable to excuse the party from the contract. *Florida Insurance Guaranty Association, Inc. v. Love*, 732 So. 2d 456, 457 (Fla. 2d DCA 1999).

In this case, I find that the evidence does not support the Defendants' claim of mutual or unilateral mistake. Rather, the Defendants were or should have been well aware that they were bidding on the Debtor's right, title and interest in any real property (including improvements to

the real property) and that there was no guarantee that personal property located at the gas station during the auction was included in the sale. Having failed to demonstrate (i) that there was a legitimate mistake of material fact or (ii) that any mistake of fact was not a direct result of their own failure to exercise due diligence, the Defendants are not excused by reason of mistake from their obligations under their respective purchase contracts. *See Jabour v. Calleja*, 731 So. 2d 792, 795 (Fla. 3d DCA 1999).

C.    **DEFENDANTS' DEFENSES OF FRUSTRATION OF PURPOSE AND IMPOSSIBILITY**

The defense of frustration of purpose refers to the condition surrounding contracting parties where one of the parties finds that the purposes for which it bargained, and which purposes were known to the other contracting party, have been frustrated to the extent that the breaching party is not receiving the benefit of the bargain for which they contracted. *Home Design Center-Joint Venture v. County Appliances of Naples*, *Inc.* 563 So. 2d 767, 770 (Fla. 2d DCA 1990). Here, the Defendants claim that inasmuch as they believed they were bidding on and contracting to buy a turnkey gas station, which included all bakery and convenience store equipment and personal property, the Debtor's "inability" to deliver this personal property destroyed the purpose for which they bid in the first instance.

The fault in this argument lies in the fact that the Defendants were bidding at a bankruptcy auction sale at which bidders were clearly put on notice that neither the Debtor nor the auctioneer were warranting the identity of any personal property being sold and certainly did not warrant to bidders that they were acquiring a turnkey operation. Instead, the bidders were vying for the purchase of property that was capable of being operated as a gas station with a convenience store and car wash. Since performance of this purpose was and is still possible, the defense of frustration of purpose or impossibility is not available. *See, e.g. Valencia Center, Inc.*

29

*v. Publix Super Markets, Inc.*, 464 So. 2d 1267, 1269-70 (Fla. 3d DCA 1985) (although performance under commercial lease was less profitable, as performance was still possible, defendant would not be excused from performance); *Lee v. Bowlerama, Enterprises, Inc.*, 368 So. 2d 913, 916 (Fla. 3d DCA 1979) (as subject property could be used for nightclub, albeit one not as large as contemplated, "doctrine of impossibility or economic frustration" were inapplicable).

Indeed, the contract language upon which the Defendants claim to have relied clearly excluded "any personal property, furniture, fixtures and equipment that may be the legal property of tenants."   At the end of the day, absent their refusal to post their additional deposit monies and close, either the PBI Defendants or Defendant Hage would have acquired real property that was capable of being operated as a gas station with gas tanks and gas dispensers.  They received the benefit of their bargain and no unusual or unforeseen events occurred which relieve them from their purchase contracts under a defense of commercial frustration or impossibility. *See M & M Transportation Co. v. Schuster Express, Inc.* (*In re M & M Transportation Co.*) 13 B.R. 861, 872 (Bankr. S.D.N.Y. 1981) ("Commercial frustration is no defense where no unusual or unforeseeable event prevented performance and where provision could readily have been made for what actually occurred.").

## D.      DEFENDANTS' CLAIM OF ANITICPATORY REPUDIATION

The PBI Defendants and Defendant Hage also seek to justify their defaults under their respective Purchase Contracts by claiming that irrespective of their own performance or lack thereof, the Debtor would not have been able to sell and deliver that which the Purchase Contracts required the Debtor to sell and deliver.  Specifically, Defendants argue that the Debtor's inability to sell "whatever personal property, furniture, fixtures and equipment so

Case 08-01833-JKO   Doc 99-1   Filed 03/12/10   Page 31 of 42

located and related to the operation of the business, (and specifically excluding any personal property, furniture, fixtures and equipment that may be the legal property of tenants)," constituted the Debtor's anticipatory breach of the Purchase Contracts, excusing the Defendants from performance.

Anticipatory repudiation of a contract relieves the non breaching party of its duty to perform under the contract and creates an immediate cause of action for breach of contract. *Hospital Mortgage Group v. First Prudential Development Corp.*, 411 So. 2d 181, 182 (Fla. 1982); *Twenty-Four Collection, Inc. v. M. Weinbaum Construction, Inc.*, 427 So. 2d 1110, 1111 (Fla. 3d DCA 1983); *see also Gaylis v. Caminis*, 445 So. 2d 1063, 1065 (Fla. 3d DCA 1984) ("the law is clear that a repudiation relieves the non breaching party of its duty to tender performance"). But application of the law to the facts presented here does not provide the Defendants with the "out" which they assert they have. The PBI Defendants and Defendant Hage defaulted under their purchase contracts before any obligation on the part of the Debtor arose. This breach on the part of the Defendants relieved the Debtor of the need to perform. *Food Management Group, LLC v. Matrix Realty Group, Inc.* (*In re Food Management Group, LLC*), 372 B.R. 171 (Bankr. S.D.N.Y. 2007). While the Defendants claim that statements by Bill Maxakoulis about Sunrise Chevron's ownership of and right to be paid for the tanks, gas pumps, and personal property located at the gas station constituted the Debtor's anticipatory breach of the parties' purchase contracts – the language of the purchase contract, the *de minimis* diligence that would have been necessary to clarify any ambiguities, and the decision not to raise any inquiries at the sale confirmation hearing leads me to find that the Defendants are not entitled to "repudiate [their] obligation to purchase the great majority of the assets under the Contract,

which the [debtor was] indisputably ready, willing and able to deliver." *Id.* at 197.[10]  And this

even assumes that I believed testimony regarding those representations.

## IV.   THE PBI DEFENDANTS' DEFENSE OF UNCLEAN HANDS DUE TO COLLUSION BETWEEN HENRI HAGE AND BILL MAXAKOULIS

Aside from the common defenses and claims of both the PBI Defendants and Defendant

Hage addressed above, the PBI Defendants also argue that they should not be liable for any

breach of their Purchase Contract due to fraudulent collusion between Defendant Hage and Bill

Maxakoulis, which artificially and improperly pushed up the bidding at the auction above $4

million. This contention was first raised by the PBI Defendants at the sale confirmation hearing

on September 16, 2008.  As such, I specifically invited the PBI Defendants to "get [themselves]

a lawyer to file something" if they wished to pursue their concern as to Maxakoulis' attendance

at the auction and his speaking with Hage during the bidding process (Ex. 6:11/17-18).  The PBI

Defendants did not do so.  Rather, it was only in response to litigation commenced by Plaintiff

Salkin months after the fact that the PBI Defendants formally raised this issue.  I will not now

permit the PBI Defendants to collaterally attack the *Final Sale Order* and the finality of the

September 16th auction sale approved by that *Order*.  While the PBI Defendants claim that there

was collusion between Defendant Hage and Bill Maxakoulis (specifically that Maxakoulis was

encouraging Hage to bid more), such encouragement in the absence of any evidence of fraud

does not relieve the PBI Defendants of their obligation to honor their bid.

The PBI Defendants nevertheless attempt to argue around the evidence by claiming that,

regardless of whether their claim of collusion is supported by the evidence, Plaintiff Salkin is

---

[10]    The PBI Defendants also permitted the *Final Sale Order* to become final and non-appealable. Their defense of Plaintiff Salkin's action is simply an impermissible collateral attack on that *Order* and the Purchase Contract which it approved.  *See Dooley v. Well* (*In re Garfinkle*), 672 F.2d 1340, 1348 (11th Cir. 1982); *see also Slocum v. Edwards*, 168 F.2d 627, 631 (2d Cir. 1948) ("The validity of the sale is not open to impeachment in any collateral proceeding…"); *Oyster Bay Cove, Ltd.*, 161 B.R. 338, 342 (Bankr. E.D.N.Y. 1993) ("it is well settled that an order of sale by the bankruptcy court cannot be collaterally attacked").

bound by a judicial admission that such collusion took place.  Specifically, the PBI Defendants reference Plaintiff Salkin's first affirmative defense of unclean hands set forth in her *Answer and Affirmative Defenses to Counterclaim* filed in the Adversary Proceeding against Defendant Hage [DE 16].  This defense was withdrawn by Plaintiff Salkin [DE 53] and is not supported by the evidence.  However, the PBI Defendants contend that since Plaintiff Salkin's pleading alleges that this collusion occurred, the PBI Defendants can rely on the allegation as a judicial admission creating an absolute defense.  I disagree.

A judicial admission is a "formal act done in the course of judicial proceedings, which waives or dispenses with the production of evidence, by conceding for purposes of litigation that the proposition of fact alleged by the opponent is true." *The Enterprise National Bank of Atlanta v. Jones* (*In re Jones*), 197 B.R. 949, 956 (Bankr. M.D. Ga. 1996).  Such a statement is not conclusive if the Court allows the party to withdraw the admission, or the pleading is amended or **withdrawn**. *See Summit United Service, LLC v. Meijer, Inc*., 2005 Bankr. LEXIS 2161, *9 (Bankr. N.D. Ga. 2005).  In this case, not only was the judicial admission upon which the PBI Defendants rely formally withdrawn by Plaintiff Salkin, but the operative pleading in which it was contained was not a pleading in the adversary proceeding to which the PBI Defendants were parties.  As such, I decline to treat the withdrawn defense as a judicial admission.  *See, e.g., The Enterprise Nat'l Bank of Atlanta v. Jones* (*In re Jones*), 197 B.R 949, 956-57 (Bankr. M.D. Ga. 1996).

**V.    PLAINTIFF SALKIN IS ENTITLED TO RECOVER ACTUAL DAMAGES INCURRED BY THE DEBTOR'S ESTATE ARISING FROM THE DEFENDANTS' BREACH OF THEIR RESPECTIVE PURCHASE CONTRACTS**

   **A.    LIQUIDATED DAMAGES V. ACTUAL DAMAGES**

   The PBI Defendants and Defendant Hage argue that even if they breached their respective Purchase Contracts, Plaintiff Salkin is limited in recovery to Defendant's $100,000 deposits posted at the auction sale. They base this argument on paragraph 2(i) of the *Bid Procedures Order* which provides as follows:

> Following the Final Sale Hearing approving the Sale to the Successful Bidder, **if such Successful Bidder fails to consummate the sale because of a breach or failure to perform on the part of such Successful Bidder, any and all of the deposit(s) of the successful Bidder shall be forfeited and retained by the Debtor as an agreed upon liquidated damages and shall not deemed a penalty** and the Backup Bid, as disclosed at the Final Sale Hearing, will be deemed to be accepted and the Debtor will be authorized, but not required, to consummate the Sale with the Backup Bidder submitting such bid without further order of the Bankruptcy Court.

Ex. 4, at ¶ 2(i) (emphasis added).

   On the other hand, the *Final Sale Order* entered by the Court on September 16, 2008, specifically provides that the sale authorized by such Order shall be "pursuant to the terms and conditions set forth in the [Purchase Contract]. The Defendants' respective Purchase Contracts contained the following provision governing the parties' rights upon a breach.

> DAMAGES FOR PURCHASER'S BREACH. In the event of default by PURCHASER in the consummation of the purchase of the PROPERTY in accordance with the terms of this CONTRACT, the deposit and interest accrued thereon shall be forfeited to SELLER. **In addition, SELLER reserves the right to pursue any and all legal remedies available at law or equity including the right to maintain an action for specific performance or to have (sic) PROPERTY resold at the risk and expense of PURCHASER.**

Ex. 4 at p. 10. (emphasis added).

Confronted with an apparent inconsistency between the language contained in the *Bid Procedures Order* and that contained in the Purchase Contract approved by both the *Bid Procedures Order* and *Final Sale Order,* the issue before the Court is which language governs and fixes the rights of the parties upon a breach. The answer is found in the *Final Sale Order* and specifically Section 9 thereof which provides that, "to the extent there is any inconsistency between the provisions of this [*Final Sale Order*] and the terms of the [*Sale Contract*], or the *Bid Procedures Order*, the provisions of this [*Sale Order*] shall control."

This result is consistent with case law which holds that it is the sale order ultimately entered by the bankruptcy court which defines the terms and conditions of sale. *See In re Moore,* 2008 Bankr. LEXIS 1120, *19 (Bankr. D.S.C. 2008). *See also LTV Aerospace & Defense Co. v. Thomas-CSF, S.A.. (In re Chateaugay Corp.),* 186 B.R. 561- 593-94 (Bankr. S.D.N.Y. 1995), *aff'd* 198 B.R. 848 (S.D.N.Y. 1996) ("[T]he successful bidder at a bankruptcy sale is bound by the offer as stated and embodied in an approval order."). Since the *Final Sale Order* entered on September 16, 2008 expressly approved the sale "pursuant to the terms and conditions set forth in the Purchase Contract" (Ex. 7:2), it is this document which governs the rights of the parties upon a breach.

Moreover, even if I were to hold that the liquidated damages language in paragraph 2(i)(i) of the *Bid Procedures Order* was incorporated into the respective Purchase Contracts of the PBI Defendants or Defendant Hage, or construe the deposit forfeiture language in the operative damage provision of the Purchase Contracts as providing for liquidated damages, Plaintiff Salkin would still have the right to sue for and recover actual damages. This is because Florida law is clear that where a contract contains both a liquidated damages provision and a

35

provision providing for the recovery of actual damages, it is the liquidated damages provision that is read out of the contract. *See Lefemine v. Baron*, 573 So. 2d 326, 327 (Fla. 1991) (Supreme Court of Florida held that the default provision in a contract was invalid as a liquidated damages clause as a matter of law if there was an option to sue for damages or to retain a deposit); *Mineo v. Lakeside Village of Davie, LLC*, 983 So. 2d 20, 21 (Fla. 4th DCA 2008); *Cloud v. Schenck*, 869 So. 2d 709, 711 (Fla. 1st DCA 2004) (because the contract provided sellers with option of retaining deposit or pursuing actual damages, it constituted "a penalty as a matter of law and is invalid"). As such, any liquidated damage remedy which Defendants argue should be read into the Purchase Contract is invalid as a matter of Florida law.[11]

The PBI Defendants and Defendant Hage also argue that equity should relieve them from being liable for damages in excess of their $100,000 bidding deposits, because as a result of reading the liquidated damages language in the *Bid Procedures Order* and listening to the auctioneer read from the same *Order* at the auction sale, they acted upon the belief that their damages were limited to the $100,000 deposits if they chose to default. While a bankruptcy court is a court of equity, I find that exercise of the Court's equitable powers is not warranted in this instance.

---

[11]    The invalidity of any liquidated damages remedy is applicable to both Plaintiff Salkin and Defendants. While the PBI Defendants have previously suggested that Plaintiff Salkin lacks standing to challenge the invalidity of such remedy, such argument is without merit. Where such remedy is invalid because the contract also provides the seller with the right to recover actual damages, the courts have held that such invalidity arises from the failure of a meeting of the minds. *Lefemine*, 573 So.2d at 329 ("the parties did not have the mutual intention to stipulate to a fixed amount as their liquidated damages in the event of a breach"). The liquidated damages provision is invalid as a matter of law and thus void. On the other hand, even in the absence of a provision permitting recovery of actual damages, a liquidated damages provision may still not be subject to enforcement if the damages are readily ascertainable and the sum stipulated as liquidated damages is so grossly disproportionate from damages that may reasonably be expected to flow from a breach. 573 So.2d at 328. It is logically the payor and not the payee, however, whom may challenge the liquidated damages provision on this basis. *Action Orthopedics v. Techmedia, Inc.,* 759 F. Supp. 1566, 1570 (M.D. Fla. 1991). The payee cannot claim that the liquidated damages amount agreed to by the parties is insufficient. In the instant case, this principle is inapplicable as Plaintiff Salkin was granted an express right to sue for actual damages.

I do not find credible Defendants' claim that the only provision of the *Bid Procedure Order* or other documents provided to them which they were cognizant of was the liquidated damages language and that they were not aware of the language in the purchase contract which permitted the seller to seek actual damages upon a purchaser's breach.  The purchase contract, the form of which was attached to the *Bid Procedures Order*, was expressly approved by such *Order*.  Moreover, paragraph 2(i)(d) of the *Order* provided that bidders "must sign the Purchase Contract at the time and place of sale, and so comply with the Purchase Contract without requesting any changes to the terms or conditions as set forth and authorized by the Court in said Purchase Contract."  Ex. 4:3.  Whether or not the Defendants, as successful or back-up bidders, were aware that the purchase contract opened them up to liability for actual damages, Defendants had ample opportunity to become aware and thus are deemed to have notice of this term and condition of sale. *Balaber-Strauss v. Markowitz* (*In re Frankel*), 191 B.R. 564, 569 (Bankr. S.D.N.Y. 1995) (terms are binding even if buyer unaware of them).  Moreover, at trial, Defendant Pradhan reluctantly conceded upon inquiry – by me – that he understood the language in the damages provision of the purchase contract to permit the seller to pursue the purchaser for damages. Pradhan Tr. 522:12-18.

Finally, Defendants argue that by filing a motion to require the forfeiture of the Defendants' $100,000 deposits, the Debtor and Plaintiff Salkin waived their right to sue for and recover actual damages and was bound by their election to seek liquidated damages.  I find this argument without merit.  As a threshold matter, since any liquidated damages provision was invalid (and not simply voidable) in the first instance as a matter of Florida law, it follows that no election to pursue such damages could be valid and subject to enforcement.  Additionally, such a demand is not deemed an irrevocable choice of remedies under applicable law.  *See Food*

*Management Group, LLC v. Matrix Realty Group, Inc.* (*In re Food Management Group, LLC*),

2007 Bankr. LEXIS 4193 at *3; *see also Ropiza v. Reyes*, 583 So. 2d 400, 401-02 (Fla. 3d DCA

1991), *citing Erwin v. Scholfield*, 416 So. 2d 478 (Fla. 5th DCA 1982).

### B.  PLAINTIFF SALKIN'S DAMAGES

Damages for breach of contract are limited to those "damages as would normally result

from the breach of contract, whether as the ordinary consequence of such breach, or as a

consequence which may, under the circumstances, be presumed to have been in contemplation of

the parties at the time they made the contract as the probable result of the breach." *In re New

River Shipyard, Inc.*, 355 B.R. 894, 905 (Bankr. S.D. Fla. 2006), *citing Poinsettia Diary

Products, Inc. v. Wessel Co.*, 166 So. 306, 310 (Fla. 1936). *See also Hodges v. Fries*, 15 So. 63,

71-72 (Fla. 1894); *Greater Coral Springs Realty, Inc. v. Century 21 Real Estate, Inc.*, 412 So. 2d

940, 941  (Fla. 3d DCA 1982).  Such damages are intended to place the non-breaching party in

as favorable position as it would have been if the contract was performed.

It is Plaintiff Salkin's position that the appropriate measure of damages arising from the

PBI Defendants' and Defendant Hage's breach is the difference between the contract price in the

Defendants' respective purchase contracts and the purchase price paid by Hunter Chambliss as a

result of the December 8th auction sale. *See In re Pizzazz Disco & Supper Club, Inc.,* 114 B.R.

104, 111 (Bankr. W.D. Pa. 1990), *aff'd*  1991 U.S. LEXIS 19998 (W.D. Pa. 1991) (defaulting

bidder liable for difference between sale price set forth in order for sale and sales conducted of

property)*; In re Governor's Island*, 45 B.R. 247, 256 (Bankr. E.D.N.C. 1984) ("a delinquent

purchaser may be ordered to pay a deficiency resulting from a resale").  This measure of

damages is consistent with the Purchase Contracts which provide that upon a breach, the seller

reserved the right to have the property "resold at the risk and expense of PURCHASER."  As to

the PBI Defendants, Plaintiff Salkin seeks actual damages in the amount of $1,265,000.00 constituting the difference between the $4,620,000 sale price set forth in these Defendants' purchase contract and the $3,355,000 sale price paid by Hunter Chambliss.  As to Defendant Hage, Plaintiff Salkin seeks actual damages in the amount of $1,210,000.00, constituting the difference between the $4,565,000 sale price set forth in this Defendant's purchase contract and the $3,355,000 sale price paid by Hunter Chambliss.

Both the PBI Defendants and Defendant Hage argue that the damages sought by Salkin are inappropriate. In fact, Defendants argue that Plaintiff Salkin cannot quantify any alleged damages due to the fact that the res of what was being sold at the December 8th auction was different than what was purportedly being sold on September 16th.  Defendants point to the difference in the purchase contracts and specifically the absence in the Chambliss contract of the language "together with whatever personal property, furniture, fixtures and equipment so located and related to the operation of the business, (and specifically excluding any personal property, furniture, fixtures and equipment that may be the legal property of tenants)."

While the above-referenced language was absent from the Chambliss contract, I find without merit the Defendants' claim that what was being sold at the December 8th auction was substantially different than what was sold at September 16th auction such that it is impossible to quantify damages based on the difference in the sales prices from such sales.  While it is true that the parties specifically excluded from sale to Chambliss those items on Exhibit A to the *Agreed Order Granting Plaintiff's Emergency Motion for Preliminary Injunction Without Notice and For Preliminary Injunction*, the *Agreed Order* went on to provide that "all other property of any kind located on the Real Property, including the gasoline tanks and fuel dispensers, belongs to the estate of Maxko Petroleum, LLC" and was included in any sale.  Chambliss' subsequent

39

purchase of the items found in Exhibit A, in addition to property of third party vendors located on the real property (such as slushy machines or soda dispensers) does not create a substantial difference between the Purchase Contracts used in the first and second auctions.  Additionally, the operating agreement with Sunrise Chevron, despite being subsequently rejected, was part of the property being sold in both the first and second auctions. Ex. 18 at 2-3.  As such, the Defendants' contention that there is a substantial difference between the two purchase contracts is rejected.

The damages recoverable in any case must be established with reasonable certainty as flowing from the wrong alleged. *Westbrook v. Bacskai*, 103 So. 2d 241 (Fla. 3d DCA 1958).  Nevertheless, uncertainty as to amount of damages or difficulty in proving damages will not prevent recovery if it is established that substantial damages were incurred as a result of the defendant's wrongful conduct. *Jet 1 Center, Inc. v. City of Naples Airport Authority* (*In re Jet 1 Center, Inc.*)*,* 335 B.R. 771, 788 (Bankr. M.D. Fla. 2005).  A compensatory damage award is appropriate if there was a reasonable basis from the evidence to support the amount. *Taylor v. Lee*, 884 So. 2d 222, 224 (Fla. 2d DCA 2004).

In the instant case, the Debtor's estate would have received the total sum of either $4,620,000 if the PBI Defendants had honored their bid, or $4,565,000 plus a deficiency claim against the PBI Defendants if Defendant Hage had honored his bid.  Three months after the Defendants defaulted, Plaintiff Salkin sold what I find were substantially the same assets to Hunter Chambliss for $3,355.000.  The loss to the bankruptcy estate was therefore $1,265,000 – of which $55,000 is solely attributable to the PBI Defendants' default, and $1,210.000 is attributable jointly and severally to the default of the PBI Defendants and Defendant Hage.  It was or should have been within the contemplation of the parties, especially in view of

depreciating property values and a deepening recession, that the Defendants' failure to close would lead to the Debtor or its successor receiving substantially less if forced to resell the property. *In re New River Shipyard, Inc.*, 355 B.R. at 905. Accordingly, I find that the appropriate measure of damages is the difference between the sale price in the Defendants' respective purchase contracts and the amount received by Plaintiff Salkin as a result of the December 8th auction. I do, however, find it appropriate to reduce such damages by the sum of $50,000 which was ultimately paid by the successful bidder to Sunrise Chevron for the equipment and furniture identified on Exhibit A to the *Agreed Order*. I also find it appropriate to award pre-judgment interest as the damages suffered by the Debtor's estate were liquidated upon Defendants' defaults under their respective purchase contracts. *Cioffe v. Morris*, 676 F.2d 539 (11th Cir. 1982).

Based upon these Findings of Fact and Conclusions of Law, it is ORDERED AND ADJUDGED as follows:

1.     That in Adversary Proceeding 08-01833-JKO, Defendants Palm Beach International, Inc. and Aabash Pradhan are jointly and severally liable to Plaintiff Sonya Salkin for fifty-five thousand dollars ($55,000.00), plus prejudgment interest from October 3, 2008.

2.     That in Adversary Proceedings 08-01833-JKO and 08-01862-JKO, Defendants Palm Beach International, Inc., Aabash Pradhan, and Henri Hage are jointly and severally liable to Plaintiff Sonya Salkin for one million one hundred sixty thousand dollars ($1,160,000.00) plus prejudgment interest from October 3, 2008.

3.     That Defendants Palm Beach International, Inc. and Aabash Pradhan shall recover nothing on their counterclaim in Adversary Proceeding 08-01833-JKO and such counterclaim is dismissed.

41

4.      That Defendant Henri Hage shall recover nothing on his Counterclaim in Adversary Proceeding 08-01862-JKO and such counterclaim is dismissed.

5.      That in Adversary Proceedings 08-01833-JKO and 08-01862-JKO, Plaintiff Sonya Salkin is entitled to costs other than attorney's fees pursuant to Fed. R. Bankr. P. 7054(d)(1).

6.      That Plaintiff Sonya Salkin is directed to file a motion setting forth the prejudgment interest and costs she seeks within ten days of this Order.

7.      That in Adversary Proceedings 08-01833-JKO and 08-01862-JKO, separate Final Judgments will be entered pursuant to Fed. R. Bankr. P. 7054 and 9021.

# # #

Copies to:

Kenneth B. Robinson, Esq.
RICE PUGATCH ROBINSON & SCHILLER, P.A.
Special Counsel for Trustee
101 NE Third Ave, Suite 1800
Fort Lauderdale, Florida, 33301
Telephone (954) 462-8000
Facsimile (954) 462-4300

Manuel R Lopez, Esq.
770 Ponce De Leon Blvd PH Suite
Coral Gables, FL 33134
305-213-7300

Bart A. Houston, Esq.
GENOVESE JOBLOVE & BATTISTA
200 East Broward Blvd
Suite 1110
Ft. Lauderdale, FL 33301
954.453.8000 (Office)
954.453.8010 (Facsimile)
954.453.8036 (Direct Line)
bhouston@gjb-law.com

Attorney Robinson is directed to serve copies of this order and file a certificate of service.